```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF PUERTO RICO
 2

 3    UNITED STATES OF AMERICA,      )
                                     )
 4                    Plaintiff,     )   Case No: 12-MJ-1139
                                     )
 5    vs.                            )
                                     )   DE NOVO HEARING
 6    NELSON JOSE RAMOS-BARBOSA,     )
                                     )
 7                    Defendant,     )

 8    _____

 9
                     TRANSCRIPT OF DE NOVO HEARING
10                          HELD BEFORE
            THE HONORABLE CHIEF JUDGE AIDA M. DELGADO-COLON
11                   Wednesday, September 5, 2012

12    _____

13
                       A P P E A R A N C E S
14

15    For the Plaintiff:

16            Ms. Dennise N. Longo Quinones, AUSA

17

18    For the Defendant:

19            Mr. Ramon L. Garay-Medina, Esq.

20

21

22

23

24

25
```

I N D E X

WITNESS

ANTONIO PIZARRO                                          PAGE

Direct Examination                                          7
Cross-Examination                                          25
Re-Direct Examination                                      36

1          THE COURT:  Let me ask.  Does the Government

2     intend to present any other witness aside from the agent

3     that testified yesterday?

4          MS. LONGO:  Your Honor, the Government has here

5     Task Force Officer Antonio Pizarro who was one of the

6     officers in the black Mitsubishi ready to testify.

7          THE COURT:   Okay.  So let's call the agent --

8          MR. GARAY:  I would like to place an objection,

9     for the record.

10          THE COURT:  For what?

11          MR. GARAY:  Very respectfully, Your Honor, the

12     bail reform act has a clear framework, and that framework of

13     the bail reform act is for the courts to have an opportunity

14     to determine if the persons could be released pending

15     disposition by the courts.  In this particular case, the

16     Government had their opportunity before Magistrate Judge

17     Camille Velez-Rive.  And it was in the best light for the

18     Government.  The Defense waived their opposition to

19     determination of probable cause.  Probable cause was

20     determined.  We waived that hearing.

21          Now the Government comes to this Honorable Court

22     with the guise that they want to bring additional evidence

23     for this Honorable Court to make a reevaluation of the

24     evidence presented before Magistrate Camille Velez-Rive.

25     And what they are doing, Your Honor, is simply trying to

1    present the trial of the case before Your Honor without the

2    rule of evidence.  That's what they are doing.  And that's

3    exactly what the rules will not allow because the bail

4    reform act has particular safeguards.  One of them is,

5    "Nothing in this section should be construed as modifying or

6    limiting the presumption of innocence."

7        The way the Government is bringing information is

8    by way of hearsay, and hearsay of hearsay of hearsay.  And

9    now they want to continue bringing the witnesses that,

10   before we had an adequate opportunity of review, prepare,

11   receive discovery material, all they want is for you to make

12   a determination about guilt, and that's exactly what the

13   rules will not allow.  There is sufficient information for

14   Your Honor to make a determination so far.

15       The weight of the evidence is one factor.  And the

16   same rules regarding determination of the bail reform act

17   clearly establishes that the weight of the evidence and the

18   nature of the offence is the very particular factor that

19   should be given less weight, otherwise this Honorable Court

20   could end up making a determination of guilt.  That's

21   exactly what the rules do not allow.

22       In this particular case, Your Honor, we have

23   proffered sufficient safeguards for the bail in this case.

24   As Your Honor well knows, in this particular situation, a

25   bail determination.  If there are conditions and are

1    conditions of release that will reasonably assure the

2    presence of the Defendant for further proceedings and

3    reasonably assure the safety of the community, he should be

4    released on bail.

5           What do they have now?  Another witness that will

6    say --

7           THE COURT:  Okay.  Mr. Garay, anything that you

8    want to -- go direct to the point in a concise fashion.  It

9    is 5:00 p.m., and I intend to go through the hearing and

10   witness testimony.

11          MR. GARAY:  I object that the Government continues

12   presenting evidence because all they want is for Your Honor

13   to make a determination of guilt.

14          THE COURT:  Okay.  First of all, at bail hearings,

15   hearsay evidence is permitted.  Secondly, your concern about

16   the Government asking the Court to make a determination of

17   guilt, remain at ease, and I will make a determination.  I

18   am fully aware that the Defendant is to be presumed

19   innocent.

20          And as to the type of evidence that the Government

21   is entitled to present at this time, I will be evaluating

22   whatever evidence that they have in terms of the

23   identification, flight risk and danger that the Defendant

24   may pose to the community.  That's what is before me.

25          So having said this, your objection is overruled.

```
 1              The Government, you may call Agent Pizarro.

 2              MS. LONGO:  Thank you, Your Honor.

 3              Your Honor, before we proceed, we would also like

 4     to revoke the rule of sequestration of the court.  We

 5     understand that there are a lot of family members in the --

 6              THE COURT:  Okay.  Mr. Garay, can you pick and

 7     choose who are going to be your witnesses so that they be

 8     placed under the rules of the court.

 9              MR. GARAY:  So far -- first of all, Your Honor,

10     let me say, one particular person was going to be the

11     employer of the Defendant.  He is not present here in court.

12     He sent me a letter.

13              THE COURT:  That we can deal by proffer.

14              MR. GARAY:  The only other person that I consider

15     to present as a witness is Dania Concepcion, Your Honor.

16              THE COURT:  Who is Dania Concepcion?  How is she

17     related to the Defendant?

18              MR. GARAY:  She is not related.  But she is the

19     religious leader of the church where he assists.

20              THE COURT:  Ok.

21              *Doña Dania, espere afuera.*

22              MS. LONGO:  Your Honor, we would also ask Agent

23     Ricardo Morales, who testified yesterday and who is in the

24     courtroom, to be sequestered in order to comply with the

25     rules.
```

1      THE COURT:  He intends to be recalled?

2      MS. LONGO:  No.  He won't be recalled.

3      THE COURT:  Okay.  So there is no reason for him

4  to step outside.  He already testified.  Very well.

5                      ANTONIO PIZARRO

6                first having been duly sworn,

7                   testified as follows:

8                   **DIRECT EXAMINATION**

9  BY MS. LONGO:

10  Q.  Good afternoon, Agent Pizarro.

11  A.  Good afternoon.

12  Q.  Please give us your full name and tell us who you are

13  employed by.

14  A.  My name is Agent Antonio Pizarro, and I am a special

15  task force agent with HSI.

16  Q.  How long have you been employed with HSI?

17  A.  Since February of this year.

18  Q.  And what kind of functions do you have in this

19  employment?

20  A.  As investigating agent.

21  Q.  I want to bring your attention to July 27, 2012.  Can

22  you tell us what, if anything, you were doing for HSI on

23  that day.

24  A.  On July 27, 2012, we met for an operation plan regarding

25  a purchase -- well, not a purchase -- the sale of 500 kilos

1    of cocaine.

2    Q.   Can you please indicate for us what was your role in

3    that operation or transaction.

4    A.   My role in that operation was to protect the undercover

5    agents as backup number two and watch out that nothing

6    happened to them.

7    Q.   In providing those services, where did you -- where were

8    you located?  And what did you do at that location?

9    A.   Okay.  I was placed close to Big Kmart in Plaza

10   Guaynabo.  And my mission there was to take care of them and

11   observe the peoples within the surrounding areas that were

12   linked to said operation.

13   Q.   And where were you located with regards to the placement

14   of the undercover agent?

15   A.   I was basically in the parking lot, and I was keeping

16   under observation the vehicle where the undercover agent

17   was.  And I was practically looking at all the vehicles that

18   were coming close to them.

19   Q.   And were you located inside a vehicle?

20   A.   That's correct.  Inside a black Lancer.  I was in a

21   black Lancer together with two other fellow officers.

22   Q.   What were the names of those officers that were in the

23   vehicle with you?

24   A.   Agent Duncan and agent Anthony Velez.

25            MS. LONGO:  Can I see Defense Exhibit 8, please.

```
 1                  (Defense Exhibit 8 handed to Prosecution Counsel.)
 2    BY MS. LONGO:
 3    Q.   Okay.  I have placed an item that has been identified as
 4    Exhibit No. 8 for the Defense.  Can you take a look at this?
 5    Do you know what it is?
 6    A.   Yes.  Here the -- it points out the official vehicles,
 7    as well as the suspect vehicles.
 8    Q.   And can you tell us in what vehicle were you located in
 9    this photo?
10    A.   I was here (Indicating) in the black Lancer next to the
11    gray 4Runner and close to the Toyota Tercel, the white
12    Toyota Tercel.  And both were to my right.  On the other
13    side you had the gray Lancer which belonged to another
14    suspect.
15    Q.   In what seat were you -- what seat were you occupying in
16    the black Mitsubishi Lancer?
17    A.   The driver's seat.
18    Q.   Can you please explain to the Court when was the first
19    time that you saw the vehicles, the Tercel and the 4Runner?
20    A.   As soon as I heard on the radio that the motorcade of
21    vehicles was coming in with the blue Cayenne -- the blue
22    Cayenne came in, a red Mercedes-Benz, a gray BMW, the gray
23    4Runner -- the gray 4Runner and the white Toyota Tercel, we
24    were informed on the radio that several vehicles were coming
25    in.  And this vehicle, the gray 4Runner, parks next to my
```

1    vehicle, close, and the Toyota Tercel parks in front of the

2    Toyota 4Runner.

3    Q.  You indicated during your testimony that you were

4    listening to some conversations on the radio.  Can you

5    explain what you mean by that?

6    A.  Okay.  As soon as the convoy of vehicles came in, it was

7    notified through the radio that these were the people that

8    we were waiting for.

9    Q.  What persons were speaking over the radio?

10   A.  Well, several fellow officers were speaking through the

11   radio.  The supervisor, as well as the agent in the case.

12   Q.  What kind of radios are you talking about?

13   A.  Official radio communication.

14   Q.  Once you saw the vehicles park right next to you, what

15   did you do?

16   A.  Well, I saw that the person that was going by and the

17   undercover agent went by my vehicle.  The undercover agent

18   together with the suspect, they passed by my vehicle, and

19   the person looked towards my vehicle.  And he did a signal

20   with his left hand.  He raised his arm.  And with his left

21   hand he did like this.  (Witness demonstrates.)

22         THE COURT:  And in doing like this, the record

23   should reflect that he moved his hand like a circle and

24   pointed to the car.

25         MR. GARAY:  The person he is referring to, is it a

1    suspect or an agent?

2            THE COURT:  Apparently a suspect.

3            MR. GARAY:  A suspect?

4            THE WITNESS:  No.  It was a suspect.

5    BY MS. LONGO:

6    Q.  When you say "the suspect", can you tell us when was the

7    first time that you saw that suspect?

8    A.  That day.

9    Q.  When did that person arrive within your sight of vision?

10   A.  That person came in the BMW truck with somebody else,

11   and they walked towards the area of the Big Kmart, and that

12   person came along with the undercover agent.

13   Q.  And that person, do you know the name of that person?

14   A.  I don't know.

15   Q.  That person -- you saw that person walk with the

16   undercover agent in what direction?

17   A.  Towards the vehicle of the undercover agent and to the

18   BMW.

19   Q.  How many times did that person walk by your vehicle

20   during your surveillance?

21   A.  He passed in front -- in front of my vehicle just once.

22   That's when he made the signal towards the 4Runner.

23   Q.  When he was walking by your vehicle, was he accompanied

24   by another person?

25   A.  He was accompanied by the undercover.

1   Q.  And when he made the signal, what did you understand
2   that signal to mean?
3   A.  Well, based on my experience as an investigating agent,
4   it was that they were placing us within the operation as
5   persons that were with the undercover agent.
6   Q.  And who did you understand he was making the signals to?
7   A.  To the people in the 4Runner and the Toyota Tercel.
8   Q.  And can you tell us who did you see in the Toyota Tercel
9   and the 4Runner?
10  A.  Inside the Toyota Tercel, I happened to see somebody,
11  but I really couldn't see that person well.  In the 4Runner,
12  since it was to my right, and as an investigating agent
13  keeping to what my duties are, which is to observe people
14  and identify them for my work, I could identify that there
15  were two people there.  And I could see the driver of the
16  4Runner because that driver was towards my right, and that
17  person was looking towards the other person who was making
18  the signal within the transaction.
19  Q.  Can you please tell us, with regards to the 4Runner,
20  where was the undercover transaction taking place?  Towards
21  the front of the vehicle or towards the back of the vehicle?
22  A.  It was towards the -- it was to the back of the 4Runner.
23  It was to the back of the 4Runner but more towards the left.
24          THE COURT:  What do you mean by "more towards the
25  left"?  Can you point in that diagram there where.

1          THE WITNESS:  Okay.  I am pointing that that's my

2    vehicle (Indicating).  This black point (Indicating) is my

3    Lancer, and the transaction is being done here (Indicating).

4          THE COURT:  Right next to the two vehicles?

5          THE WITNESS:  I am sorry?

6          THE COURT:  Where was the transaction taking

7    place?  Can you put an X where the transaction was taking

8    place.

9          THE WITNESS:  The transaction was being conducted

10   over here (Indicating).

11         THE COURT:  So what you are saying is that the

12   driver of the 4Runner was looking towards his right, which

13   will be the left of the screen in this case.

14         THE WITNESS:  That's correct.  Yes.

15         THE COURT:  And then you were seated in the

16   driver's seat of the black Lancer.

17         THE WITNESS:  That's right.

18         THE COURT:  That means that you were facing, in

19   essence, the fence that we see in that drawing as well;

20   correct?

21         THE WITNESS:  Yes.  I was looking to both sides.

22         THE COURT:  Okay.  When you looked towards your

23   right, what could you see?

24         THE WITNESS:  In the 4Runner there were two

25   individuals there, and I could see that one of them -- well,

1   when the suspect passed by with the undercover agent that he

2   made the signal, I could see that they -- because of their

3   reaction they had they were with the suspect.  And I could

4   see -- I saw the face of one of the individuals.  But the

5   one on the passenger's side, I couldn't see well because he

6   was looking over his shoulder towards his left in this

7   position (Witness demonstrates).

8        What I could only see of the passenger was that he

9   had a dark gray shirt.  And the other individual, the

10  driver, I could see well because that person, he was looking

11  towards my vehicle, and I could see him through the window,

12  through the back right window of my car, because my car was

13  a four-door vehicle.  And this individual had a red shirt,

14  glasses.  He was thin.  He was a dark skinned.  He had short

15  hair, and I could see him well.

16  BY MS. LONGO:

17  Q.  So you were able to see that person's face clearly

18  through the window?

19  A.  That's correct.

20  Q.  And do you see that person in the courtroom here today?

21  A.  That's correct.

22  Q.  And can you please indicate where you see that person

23  here today?

24  A.  Here in the courtroom.

25  Q.  Can you tell us where he is seated?

1    A.  Yes.  He is seated right there next to the older

2    gentleman.

3    Q.  Can you tell us what kind of shirt this individual is

4    wearing?

5    A.  He has an inmate uniform.

6         MS. LONGO:  Let the record reflect that he has

7    identified the Defendant sitting next to counsel.

8         THE COURT:  Record will so reflect.

9    BY MS. LONGO:

10   Q.  Can you tell us how long the transaction took place from

11   when the person that was walking with the undercover agent

12   walked by your vehicle and, you know, the transaction took

13   place?

14   A.  Approximately 15 minutes.

15   Q.  And how many times did you look at the Defendant during

16   those 15 minutes?

17   A.  On many occasions.  A lot of occasions.

18   Q.  And during that time, did you have an opportunity to say

19   anything about your exchange with -- or visual exchange with

20   the Defendant?

21   A.  That's correct.  I notified through the radio.  I asked

22   that who was going to take care of that individual who was

23   in that vehicle, who was going to be in charge of that

24   because of the signal that had occurred.  Then we understood

25   that something bad was happening.

1    Q.  When you say that somebody needs to take care of that

2    vehicle, can you explain what that means to the Court?

3    A.  Okay.  When I asked who was going to take care of that

4    vehicle, who was going to detain that vehicle, the answer I

5    am given that it was going to be a marked unit.  It was

6    going to be a vehicle of --- that had HSI agents.  In this

7    case it was a marked police vehicle.  These agents are also

8    identified within the patrol unit with their police jackets.

9    Q.  Okay.  Can you please tell us what happened after the

10   undercover agent and the gentleman from -- that walked with

11   him left your vicinity or went back to the other vehicles?

12   A.  Okay.  So when that individual goes by my vehicle and

13   does the signal, then they go towards the BMW, and they open

14   the back of the BMW.  And then that individual does another

15   signal, which in our terminology, anybody who works as an

16   undercover agent, as a police officer -- well, then

17   something unusual was done which is that he takes off his

18   cap.  He takes off his cap, and then the Tercel starts to

19   move.  It starts to back up.

20   Q.  Let's clarify a little bit before that.  The signal by

21   the gentleman that was walking with the undercover, when did

22   he give that signal?

23   A.  When the vehicle with the -- when the van from the other

24   undercover arrives with the 500 kilos were coming in of

25   cocaine, then the back is opened, and that's where -- when

1    he sees.  And then that's the signal occurs that he takes

2    off his cap.  And the Tercel, the Toyota Tercel, starts to

3    move.

4    Q.  So the vehicle that they opened the back of, what

5    vehicle is that they are opening up?

6    A.  That's the BMW.

7    Q.  They opened the BMW?

8    A.  That's correct.  Yes.  The back of the BMW.

9    Q.  The drugs were in the BMW?

10   A.  The money was in the BMW.

11   Q.  What happened after the Toyota Tercel moved?

12   A.  Okay.  As soon as the BMW opens, the individuals see

13   what's in the back of the van, that the van is an official

14   vehicle.  Then after that, that's when the Toyota Tercel

15   starts to move, starts backing up, and begins to move.  When

16   it begins to move, I am given instructions that we are going

17   to move with them quickly.  When we go to the front -- when

18   I go to the front to look for backup, for coverup, some

19   vehicles that were there, that's when I hear the shots.

20   Q.  And what happens to the Toyota 4Runner?

21   A.  I start moving to the front.  And then the Toyota

22   4Runner moves ahead, and I stopped seeing it.

23            THE COURT:  Which means that the 4Runner moves

24   through the space in the parking lot that the Tercel had

25   abandoned.

1    THE WITNESS:  That's correct.

2    BY MS. LONGO:

3    Q.  Was the 4Runner detained at the location?

4    A.  The 4Runner wasn't detained, because I then saw that the

5    fellow officer of the marked unit had some torn pants, and

6    he had a laceration in the knee.  And he had the phone -- he

7    had the official phone in his hand, and it was broken.  And

8    when we asked if everybody was all right, he said that when

9    he was going to detain the 4Runner that he had to

10   practically throw himself on the pavement because if not,

11   the 4Runner was going to run him over.

12   Q.  After the incident, did you get an opportunity to

13   discuss the identity of the driver of the 4Runner with other

14   agents?

15   A.  That's correct.

16   Q.  At that time were you shown a photograph to conduct an

17   identification of the driver of the 4Runner?

18   A.  Several pictures were shown to me.  When I was shown

19   those pictures, I was shown one of a person who didn't have

20   glasses, and I said, "It's this person, but he had glasses."

21   And in the identification that we had, we didn't have him.

22   And I drew some glasses, and I said, "This is the individual

23   with glasses."

24   THE COURT:  How many pictures were you shown, if

25   you remember?

1      THE WITNESS:  I was shown about five or six

2   pictures.

3   BY MS. LONGO:

4   Q.  I am going to show you what has been identified as

5   ID-23.  Can you tell me what this is?

6   A.  Yes.  That's the picture that I was shown and the

7   drawings of the glasses I did.

8   Q.  And who is the person depicted in that photo?

9   A.  That's the person who was driving the Toyota 4Runner.

10   Q.  And do you know that person's name?

11   A.  Nelson Ramos-Barbosa.

12      MS. LONGO:  Your Honor, I would like to have this

13   marked as Exhibit 23, if there are any objections.

14      THE COURT:  Admitted.

15   BY MS. LONGO:

16   Q.  As part of the investigation into the identity of the

17   driver of the 4Runner, did you have an opportunity to

18   participate in an interview of anybody?

19   A.  That's correct.  Yes.

20   Q.  And where did that interview take place?

21   A.  In the correctional institution of Bayamón.

22   Q.  And what did you learn at that interview?

23   A.  An inmate gave us some information.  He had some

24   information for us.  When I am referring to "us", it was

25   that Agent Crespo was accompanying me.

1    When he began to talk that he had information, that he

2    had information on who were the people that were in that

3    transaction that day and that had left.  After that he tells

4    us that that person was in the area of Toa Baja, that the

5    person was sad because he had lost a friend and that he was

6    armed according to the information that he had.  We asked

7    them how was that person.  And he told us that the person

8    was thin, dark skinned, thin, clean cut, a young person.

9    And Agent Crespo took out several pictures.  He showed them

10    to him, and he stated that the person that he had mentioned

11    that he was talking about was Nelson Ramos-Barbosa.  And I

12    asked him, because I had to corroborate the information, how

13    was that person dressed, and he told us that that same day

14    in the evening that he had gone -- and I asked him how was

15    he dressed, and he said that he had some dark jeans on and

16    that he had a red shirt.

17    Q.  Did you have an opportunity to go search for Nelson

18    Ramos-Barbosa after that interview?

19    A.  That's correct.

20    Q.  And can you tell us when that occurred?

21    A.  After that we met at the office.  I don't remember what

22    was the exact day, but it was early in the morning.  And we

23    went to the home with a search warrant of Gonzales-Ramos.

24    As part of security there, we had to control several

25    people at the home.  And I asked a resident of that home, I

1     tell him, "You know who we are looking for."  But I never

2     told him the name.  And he said that the person that you are

3     looking for isn't here.  And I asked where was that person.

4     And he told me how to get to the home, that the home was of

5     a second floor and that it had blue finishing, it was yellow

6     and also white, and it was at the end of that same street.

7          I informed my supervisor, and they determined to make an

8     operation plan to get to the home.  Then after that the

9     specialized group, which is the SRT, they reached the home,

10    and my supervisor told me to stay behind, that he didn't

11    want me inside that type of operation.  And when he calls me

12    I can hear that there is somebody inside a gold Toyota Camry

13    giving rounds through the area.  That's when he got stopped.

14         When he was stopped, then my supervisor sent for me, and

15    I got there.  And when I get out of the car, I say -- and

16    these were my exact words -- I told my supervisor, "You see

17    that he had glasses," because in the picture that I was

18    shown he didn't have glasses on.  And that's where I see

19    Nelson.  And more so, my fellow Officer Duncan was there,

20    and he was saying, "That's him.  That's him."

21                MS. LONGO:  I have nothing further, Your Honor.

22                THE COURT:  Cross.

23                MR. GARAY:  Yes.

24                May I have the picture of --

25                Your Honor, before we proceed, we would like to

```
 1     request all the statements and reports that this agent has

 2     provided before.

 3               THE COURT:  Do we have any written statements or

 4     reports from the agent?

 5               MS. LONGO:  We have them right here, Your Honor.

 6               THE COURT:  Very well.

 7               MR. GARAY:  Your Honor, may we have five minutes

 8     to review?

 9               THE COURT:  Five minutes.

10               MR. GARAY:  Thank you, Your Honor.

11               THE COURT:  Do you have a full report there?

12               MR. GARAY:  I don't know.  I don't know if this is

13     another --

14               THE COURT:  I understand.  I think that's the back

15     of the page where you can see the kind of the pressure of

16     the ink of the handwriting.

17               MS. LONGO:  The scanner, if it perceives any ink

18     on the back side, copies it too.  So that's why its

19     generated with the back side of the document.

20               THE COURT:  So what you have is a page with the

21     note and the back of that page.

22               MR. GARAY:  Okay.

23               THE COURT:  I think that you will manage to go

24     through it.  If that's what I have here, you will be able to

25     go through it very quickly.
```

1          Agent, can you tell me, when was it that you -- do

2     you remember the date which you saw the picture of the

3     Defendant and you drew the eyeglasses?

4          THE WITNESS:  I don't remember the date.

5          THE COURT:  And when did you get to see those five

6     or six pictures from which you identified the Defendant?

7          THE WITNESS:  After the facts.

8          THE COURT:  After the facts.  Where?  After the

9     facts in the mall?

10          THE WITNESS:  That's correct.

11          THE COURT:  Before or after you drew the glasses

12     on the other picture?

13          THE WITNESS:  I am sorry?

14          THE COURT:  Was it before or after having seen the

15     picture where he drew the glasses?

16          THE WITNESS:  The facts are prior.  I saw the

17     picture after the facts.

18          THE COURT:  That I can gather.  I want to know

19     which of the set of the pictures you saw first.

20          THE WITNESS:  I saw the picture of several people

21     together with the one of Ramos-Barbosa.

22          MR. GARAY:  Your Honor, I would like to request

23     those pictures.  That's part of his identification process.

24          THE COURT:  Do you have those pictures, Counsel?

25          MS. LONGO:  We do not, Your Honor.

1          THE COURT:  Are those within the package that I

2   received?

3          MS. LONGO:  The ones within the package are the

4   ones that were provided to the source of information.  We

5   don't have the ones that were provided to the agent.

6          THE COURT:  Okay.  Let's move on.

7          But still you haven't answered my question.  I

8   would like to know, from those set of pictures and the small

9   tiny picture in which you drew the glasses, which of those

10  you saw first.

11         THE WITNESS:  I saw several pictures, but I didn't

12  see his.  I saw his after about the fourth picture.

13         MS. LONGO:  Your Honor, if we may clarify a little

14  bit.

15         THE COURT:  Yes.

16  BY MS. LONGO:

17  Q.  When you saw the picture where the glasses are drawn,

18  was that a set of pictures that were shown to you together?

19         MR. GARAY:  Your Honor, you made the question, and

20  he understood your questions.

21         THE COURT:  Wait.  Wait.  Wait.

22         MS. LONGO:  Can you translate --

23         THE INTERPRETER:  I'm sorry.  What's your ruling,

24  Your Honor.

25         THE COURT:  Translate the question.  I want him to

1    answer.

2          THE WITNESS:  Yes.  I was shown several pictures

3    all of them together.

4          THE COURT:  And that's when you drew the glasses

5    on top of one?

6          THE WITNESS:  That's correct.  Yes.

7          MS. LONGO:  And, Your Honor, for further

8    clarification.

9    BY MS. LONGO:

10   Q.  Were those pictures, were they all similar type of

11   pictures?  What type of pictures were they?

12          MR. GARAY:  Your Honor --

13          THE COURT:  Let her finish the question.

14          THE WITNESS:  They were similar.

15   BY MS. LONGO:

16   Q.  Were they printouts from a computer?

17   A.  Yes, they were printouts from a computer.  The same that

18   I was shown here.

19   Q.  What type of printouts?  From what type of database?

20   A.  It's from the database of HSI, from the agency as such.

21          THE COURT:  Okay.  Let's move on.

22          You reviewed your notes.  Let's go to the cross.

23                    **CROSS-EXAMINATION**

24   BY MR. GARAY:

25   Q.  Okay.  On July 27, 2012, you met to discuss an

1    operational plan with some other agents.

2    A.   That's right.

3    Q.   And in that plan you were going to be located close to

4    the Big Kmart area.

5    A.   In that plan it was later that I was told that it was

6    going to be the Big Kmart -- because it was in Guaynabo, but

7    it was later that I was told that I was going to be there.

8    Q.   From questions by sister counsel, you said that you were

9    going to be placed close to the Big Kmart area.

10   A.   After they knew exactly where the operations was going

11   to take place.

12   Q.   Your duty there, you were going to take care, watch for

13   the safety of the undercover agents.

14   A.   Correct.

15   Q.   The undercover agents' safety was your priority.

16   A.   Correct.

17   Q.   And it was also the priority of those other agents with

18   you.

19   A.   Correct.

20   Q.   You made some markings in the diagram in front of you.

21   Is this the area where the transaction allegedly was taking

22   place?

23   A.   Close to that area.  Around that area.

24   Q.   There are bushes in that area.  The transaction was

25   behind those bushes?

1    A.  The bush is a large tree, and we did have field of

2    vision towards where the transaction occurred.

3    Q.  So your vehicle, which is marked here, is facing to the

4    front.

5    A.  Correct.

6    Q.  And the transaction area is to the front and the left.

7    A.  Correct.

8    Q.  The 4Runner is parked facing the other way to the right

9    of your vehicle.

10   A.  Correct.

11   Q.  So the 4Runner is facing that way (Indicating) and your

12   vehicle is facing the other way?

13   A.  Correct.

14   Q.  And your priority was the safety of the undercover

15   agents.

16   A.  Correct.

17   Q.  So you were constantly facing -- looking at the area

18   where the undercover agents were located.

19   A.  I was looking at the complete operational area, not only

20   that one.

21   Q.  But your principle objective was the safety of the

22   undercover agents.

23   A.  Correct.

24   Q.  But from the place where you were parked, you were in

25   the driver's seat; correct?

1  A.  Correct.

2  Q.  The vehicle is a Mitsubishi Lancer.

3  A.  Correct.

4  Q.  Your vehicle is taller than the 4Runner -- your vehicle

5  is smaller than the 4Runner.

6  A.  Correct.

7  Q.  And it's lower on the -- on the area, it's lower than

8  the 4Runner.

9  A.  Yes.

10  Q.  And when you look to the side from where you were

11  standing, next to you was your fellow officer.

12  A.  Inside the vehicle was my fellow officer, and we were

13  next to the 4Runner.

14  Q.  What's the name of that agent next to you?

15  A.  Duncan.

16  Q.  And when you looked directly to Agent Duncan, Agent

17  Duncan is in the back of the 4Runner; isn't that correct?

18  A.  Correct.

19  Q.  You could not see the driver from that position, in

20  spite of the 4Runner.

21  A.  Not from that position.  But if I looked through that

22  back window, yes.

23  Q.  So when you looked to the back of your window, could you

24  see the driver or you could see the passenger?

25  A.  Both.

```
 1   Q.  You could see both of them?

 2   A.  That's right.  I could see both.

 3   Q.  Your vehicle was lower; mas bajo.  Your vehicle is

 4   lower.

 5   A.  Correct.

 6   Q.  The 4Runner is higher.

 7   A.  Correct.

 8   Q.  And from that glass, you could see the driver on the

 9   other side of the 4Runner?

10   A.  When I looked through the back window, yes.

11   Q.  What description, if any, you provided of the passenger

12   of the 4Runner?

13   A.  The passenger was dark skinned, had a dark gray shirt.

14   Q.  And the other one was thin with a red shirt?

15   A.  Thin with a red shirt with glasses, earrings, and he was

16   looking at us the whole time.

17   Q.  Sir, how many reports you have prepared indicated those

18   details that you have given today here?

19   A.  Besides my notes?

20   Q.  Besides your notes.

21   A.  I prepared one.

22   Q.  What?

23   A.  One report.

24         MR. GARAY:  Your Honor, I would like to have that

25   report.  But I will proceed with the interrogation.
```

1    BY MR. GARAY:

2    Q.  You indicated that you were waiting at some point when

3    you received information that a convoy was arriving there.

4    A.  That's right.

5    Q.  Referring to vehicles that were coming together.

6    A.  That's right.

7    Q.  And you described a red Mercedes.

8    A.  That's right.

9    Q.  And according to the information you are providing here,

10   that was part of the convoy.

11   A.  That's right.

12   Q.  Was the person driving that Mercedes arrested?

13   A.  That person was detained.

14   Q.  But you indicated he was part of the convoy.  He was

15   still arrested?

16   A.  The person was detained.

17   Q.  My question:  Is he still detained?  Yes or no?

18   A.  I don't know.  I don't think so.

19   Q.  He was part of the convoy; yes or no?

20   A.  Correct.

21   Q.  But he wasn't arrested?

22   A.  He was detained.

23   Q.  But he was freed afterwards?

24   A.  That's right.

25   Q.  So then he was not part of the convoy.

1          THE COURT:   Come on, Counsel.   Whatever inference

2     you want, let's go straight to the point.   It's 6:00 p.m.

3     BY MR. GARAY:

4     Q.   You indicated at some point someone made some kind of

5     indication when they passed in front of your vehicle.

6     A.   Correct.

7     Q.   When the person passes in front of your vehicle, what

8     direction he was walking to?   To the vehicle where the money

9     and the drug transaction was taking place?

10    A.   No.   The person is the one that walks in front of my

11    vehicle with the undercover towards the BMW, and they go by

12    the front of my vehicle.

13    Q.   So he was walking towards the vehicle close to the

14    bushes?

15    A.   Close to the tree, yes.

16    Q.   The vehicle you were in, the Mitsubishi Lancer, also had

17    dark tinted glasses?

18    A.   Correct.

19    Q.   And the 4Runner next to your vehicle also had dark

20    tinted vehicle -- dark tinted glasses?   Excuse me.

21    A.   The 4Runner had clear tinted windows.

22    Q.   When you -- after the Toyota Tercel moves out, you

23    indicated that the 4Runner moved to that same area.

24    A.   What I said was that when the vehicle started to move,

25    the Toyota Tercel started to move and left the space open,

1    and then I started to move.

2    Q.  From a question by the Honorable Judge, you said that

3    when the Toyota Tercel got out of the way, you said that the

4    4Runner moved ahead.  So it was moving ahead into the

5    parking where the Toyota Tercel was before?

6    A.  It moved towards the space that the Tercel was

7    occupying.

8    Q.  So at that point your vehicle is facing that way

9    (Indicating) and the 4Runner is moving the other way

10   (Indicating)?

11   A.  That's correct.

12   Q.  So after the 4Runner parked in that space, you did not

13   have any more vision of that person -- of those persons

14   inside that vehicle?

15   A.  That's correct.  I didn't have any vision because I

16   already had seen them.

17   Q.  And you said that you know the description the person is

18   thin; is that correct?

19   A.  Correct.

20   Q.  Short hair?

21   A.  Correct.

22   Q.  Dark skin?

23   A.  Correct.

24   Q.  And you could make those observations inside a dark

25   tinted vehicle?

1    A.   Correct.

2    Q.   Of a vehicle that's facing the other way?

3    A.   Of a vehicle that I have vision of the person that I am

4    looking.

5    Q.   Please answer my question.  Of the vehicle facing the

6    other way; yes or no?

7    A.   Yes.  Correct.

8    Q.   Where next to your fellow officer is the back of that

9    vehicle?

10    A.   I am sorry?

11    Q.   When you looked through your fellow officer, you could

12    see from that vehicle, from the Toyota 4Runner, the back of

13    the vehicle?

14    A.   That's right.

15    Q.   And you have indicated that when looking through the

16    glass, the back door glass, you could see the driver on the

17    other side of the Toyota 4Runner.  Yes or no?

18    A.   That's correct.  Yes.

19    Q.   And when you were doing this, you were observing very

20    carefully that driver or the undercover agents you were

21    providing safety?

22    A.   I was looking at both.

23    Q.   You are a trained police officer.

24    A.   Correct.

25    Q.   Before being in the task force, were you an agent for

1    the Puerto Rico Police?

2    A.  An agent for the Special Investigations Bureau.

3    Q.  Sir, would you agree with me that the description thin,

4    short hair and dark skin resembles 1.5 million

5    Puerto Ricans?

6    A.  That I don't know if that is such amount.

7    Q.  Would you agree with me that that description could fit

8    20 Puerto Ricans?

9    A.  Could be.

10   Q.  Would you agree with me that that description could be

11   50 Puerto Ricans?

12   A.  The general description of many Puerto Ricans.  But the

13   specific one, no.

14   Q.  Red shirt, that type of description, is it used

15   frequently?  You remembered the shirt of a person that was

16   driving a vehicle and that driver on the other side of the

17   vehicle, you facing another way?

18   A.  Depends on the situation I am in.

19   Q.  Sir, you indicated that at some point you were with some

20   other agents in the area where Mr. Ramos-Barbosa lives.

21   A.  I said that I was with other agents executing a search

22   warrant in the residence of Gonzales-Ramos.

23   Q.  Yes.  During that same day is the day when you moved to

24   the area where Mr. Ramos-Barbosa lives?

25   A.  Correct.

 1    Q.  Please rephrase that.  You said that Mr. Ramos-Barbosa

 2    was doing turnarounds on the street.  You said something

 3    about what he was doing when you saw his vehicle, the Toyota

 4    Camry -- the gold Toyota Camry.

 5    A.  That's information I received through the radio.

 6    Q.  That's not known to you?

 7    A.  I see him when he is detained.

 8    Q.  He is stopped in front of his house.  Mr. Ramos-Barbosa

 9    stopped his vehicle in front of his house?

10    A.  I don't know.  I saw him when the fellow officers had

11    already detained him.

12    Q.  So from your -- from the place you were standing, you

13    could not see when he got to his house?

14    A.  Well, I saw the car before it reached his home.  I

15    didn't see when they actually detained him.  I saw him

16    afterwards when he was already detained.

17    Q.  Based on information -- did you receive information that

18    Mr. Ramos-Barbosa returned upon request by fellow agents

19    from your agency?

20    A.  I don't have that information.

21    Q.  And you don't have information either that some agents

22    requested Mr. Ramos-Barbosa to call him to return to his

23    house?

24    A.  No.

25    Q.  Regarding the person you indicated that you interviewed

1    in the correctional institution, that person was in a

2    correctional institution for a crime he committed or

3    detained pending a trial?

4    A.   That person was a pretrial detainee.

5    Q.   And that person told you about a person he saw before,

6    but you did not request a description, a physical

7    description, from that person before showing photos to him?

8    A.   Yes.   It was asked.

9    Q.   Is that description in your notes?

10   A.   Those notes are from July 27.

11          MR. GARAY:   Your Honor, then there are other notes

12   that we don't have.

13          THE COURT:   Who prepared the notes of July 27?

14          THE WITNESS:   Agent Crespo.   Raul Crespo.

15   BY MR. GARAY:

16   Q.   Are you referring to these notes (Indicating)?

17   A.   No.   I prepared those on July 27.

18          MR. GARAY:   I have no more questions, Your Honor.

19          THE COURT:   Any redirect?

20          MS. LONGO:   Your Honor.

21                    **RE-DIRECT EXAMINATION**

22   BY MS. LONGO:

23   Q.   Agent Pizarro, you indicated that you prepared a report

24   in this case.

25   A.   Correct.

```
 1    Q.  Has that report been filed with the case agent?

 2    A.  No.  It hasn't because that report was prepared based on

 3    the notes that I had, and I was asked for the notes that I

 4    had originally.

 5    Q.  So you have not finalized that report?

 6    A.  No, I haven't.

 7    Q.  And you haven't filed it?

 8    A.  That's correct.  I haven't.

 9            MS. LONGO:  Nothing further, Your Honor.

10            THE COURT:  Okay.  You are excused, sir.

11            (Witness excused.)

12            MS. LONGO:  The Government has nothing further.

13            THE COURT:  Very well.  I take it that the Defense

14    has witnesses, in essence, at this time which is -- you

15    already selected persons from the church and the testimony

16    of the perspective employer whom you want to proffer.

17            MR. GARAY:  As a matter of fact, I will proffer

18    the testimony of the employer due to the fact that he was

19    here yesterday, but he was not able to return today.

20            THE COURT:  Okay.  You can proffer it.

21            MR. GARAY:  The essence of the testimony from

22    Mr. William Otero (Phonetic), he is the owner of Chidos and

23    Criollo Cafe -- as a matter of fact, the letter is annexed

24    to the motion I filed, Your Honor, to the brief in this

25    case.
```

 1              THE COURT:  Okay.

 2              MR. GARAY:  And basically he indicates that he has

 3     been the owner of this place since 2000, I believe, 2009,

 4     that Mr. Ramos-Barbosa works with him as full-time cook and

 5     that Mr. Ramos-Barbosa was working in that place, in that

 6     same place, since before he bought the place.  And he

 7     continues -- Mr. Ramos-Barbosa continues working for him.

 8     That Mr. Ramos-Barbosa's work shift is from Monday to

 9     Friday, 6:45 a.m. to 4:00 p.m.

10              THE COURT:  I'm sorry.  Can you repeat that.

11              MR. GARAY:  His labor work shift is from Monday to

12     Friday, 6:45 a.m. to 4:00 p.m.  But he also indicates in the

13     letter that on some Fridays, Mr. Ramos-Barbosa stays working

14     until 8:30 or 9:00 p.m. for the happy hour service.  And he

15     indicates that he is very pleased with the performance of

16     Mr. Ramos-Barbosa, integrity and compromised with his work.

17     And he expressed that if Mr. Ramos-Barbosa is released, his

18     work is guaranteed at the moment that he is able to return

19     to work.

20              THE COURT:  Okay.

21              MR. GARAY:  The other document, Your Honor, that I

22     proffer with my brief is the National University College of

23     Bayamón, the student program of Mr. Ramos-Barbosa for this

24     trimester.  It indicates that Mr. Ramos-Barbosa studies

25     pursuant to a bachelors degree in criminal justice and that

```
 1    he studies from 5:45 p.m. until 9:15 p.m. from Monday

 2    through Thursday, Your Honor.

 3              Regarding the testimony of -- to speed up this

 4    matter, Your Honor, regarding the testimony of

 5    Ms. Dania Concepcion.

 6              THE COURT:  What is her name?

 7              MR. GARAY:  Dania.  She is one of the principals

 8    of the Iglesia Evangelica Jehovah Shammah in Levittown.  If

 9    she takes the stand, she will testify that

10    Mr. Nelson Ramos-Barbosa is one of the members of the

11    church.

12              MS. LONGO:  Your Honor, if she is here, can she

13    testify.

14              THE COURT:  Well, he can proffer.  If you want to

15    cross-examine, we call her and put her under

16    cross-examination, and we will save some time.

17              MR. GARAY:  Just to speed up matters, Your Honor.

18              She will also testify that Mr. Ramos-Barbosa

19    assists to the church on Fridays and Sundays.  On Fridays,

20    Your Honor, is the special young adults meetings of the

21    church, and Mr. Ramos-Barbosa assists on Fridays.  And on

22    Sundays, he assists to the church the regular session of the

23    church.  And that he has assists with his wife,

24    Isamar Mercado, a person here in court also.

25              Regarding the rest of the evidence, it was
```

```
 1      proffered before Magistrate Judge Velez-Rive.
 2   Mr. Ramos-Barbosa --
 3              THE COURT:  And it's a matter of record.
 4              MR. GARAY:  It's a matter of the record.  Lifelong
 5   resident of Puerto Rico.
 6              The only difference at this point is that during
 7   that hearing we proffered Magistrate Judge Velez-Rive that
 8   the family was trying to determine a property that could be
 9   used for bail purposes.  And at that point I just submitted
10   an appraisal form regarding that property.
11              Today we have here in court the certified deed,
12   the certificate from the property registry, the certificate
13   from the CRIM, and I believe there is an initial document
14   requested by the clerks office to use that property as a
15   bail bond, as a security.  That property was valued at
16   $75,000.  It could be good for a $52,000 bail.  And as a
17   matter of fact, the Honorable Magistrate Judge Velez-Rive
18   set bail secured in the amount of $50,000.
19              THE COURT:  Okay.  Very well.
20              So the Prosecutor wants to cross-examine
21   Dania Concepcion.
22              MS. LONGO:  Well, we would just like to know the
23   services that the Defendant -- that you testified that he
24   attends.
25              MR. GARAY:  Let me add one important thing for the
```

1     Government.  One important detail.

2              On July 27, 2012, Mr. Ramos-Barbosa assisted to

3     the services of the young adults of the church, and

4     Ms. Dania Concepcion could attest to that fact because she

5     was there directing the services.  And he was there with

6     them on that night.

7              THE COURT:  At what time was that?

8              MR. GARAY:  The services started about 7:00 p.m.,

9     Your Honor.

10             THE COURT:  Okay.

11             MR. GARAY:  And ended about 9:00 or 10:00.

12    That's, more or less, what she told me.  Sometimes they

13    finished the service, but they --

14             THE COURT:  That doesn't add much in terms of an

15    alibi.

16             MR. GARAY:  Well, I am not presenting at this

17    point an alibi.

18             THE COURT:  But since you had mentioned that --

19             MR. GARAY:  I will make this proffer to the Court

20    regarding an alibi.  During July 27, in the morning,

21    Mr. Ramos-Barbosa took his wife, Isamar Mercado, present

22    here in court, to her work.  She works close to the *Parque*

23    *de la Cencias*, Bayamón.  After that he went to the food

24    business that the father of Isamar Mercado has in the

25    Levittown area.

1          At about 2:30 or 3:00 p.m., he was already waiting

2     for his wife at her work in his car, and he picked her up.

3     They went home.  There is another friend who was with them

4     some of this time.

5          THE COURT:  He had a friend that was with him when

6     he picked her up?

7          MR. GARAY:  No.  No.  This friend was at their

8     home or where they met afterwards.

9          MS. LONGO:  Does that friend have a name?

10         MR. GARAY:  Yes.  Elian Arroyo Roman.  She is a

11    close friend of them.  She works at Plaza Del Sol at

12    Universal Glasses.  She has a bachelor degree in criminal

13    justice from HUMET, graduated on 2011.

14         The parent-in-law of Mr. Ramos-Barbosa is

15    Mr. Victor Mercado, present here in court.

16         THE COURT:  Is the name Victor Mercado?

17         MR. GARAY:  Victor Mercado.  This is the father of

18    Isamar Mercado.

19         THE COURT:  Is he here?

20         MR. GARAY:  He is present here.  As a matter of

21    fact, Your Honor --

22         THE COURT:  Mr. Mercado, (Speaking Spanish.)

23         MR. MERCADO:  (Speaking Spanish.)

24         THE COURT:  (Speaking Spanish.)

25         MR. MERCADO:  (Speaking Spanish.)

```
 1                    THE COURT:  (Speaking Spanish.)

 2                    MR. MERCADO:  (Speaking Spanish.)

 3                    THE COURT:  (Speaking Spanish.)

 4                    MR. MERCADO:  (Speaking Spanish.)

 5                    THE COURT:  Okay.

 6                    MR. GARAY:  That will be -- we are still

 7     investigating this matter.  We are requesting -- I'm trying

 8     to secure videotapes from security cameras from different

 9     places where Mr. Ramos-Barbosa could have been during that

10     day.

11                    THE COURT:  Okay.  Very well.

12                    The Government had a question concerning the

13     testimony of a lady from the church.  What is it that you

14     wanted to know?

15                    MS. LONGO:  The same question of the Court, just

16     when the time of the services were, which is -- I guess was

17     indicated from 7:00 p.m. to 9:00 p.m.

18                    THE COURT:  Okay.

19                    I am not committing myself to anything.  I still

20     have to review -- the Government filed today the motion with

21     the requested information.  Actually, it was filed late and

22     still I was having my sentences during the afternoon and

23     dealing with the matter of budgets.  So I have not been able

24     to listen to this.

25                    MS. LONGO:  Your Honor, with regards to the
```

```
 1    Grand Jury testimony, that Grand Jury testimony is for the

 2    indictment of the first three Defendants:  Mr. Rivera-Erazo,

 3    Gonzales-Ramos, Mr. Matias-Maestres.  In that Grand Jury

 4    testimony there was really no evidence presented with

 5    regards to either Nelson Ramos-Ramos or Nelson

 6    Ramos-Barbosa, just for your information.  If you are

 7    looking for testimony regarding identification of the

 8    Defendant in this case, we do not believe that there would

 9    be any information in that Grand-Jury testimony because that

10    was for the indictment of the other three.

11             THE COURT:  So what remains is the testimony of

12    the agents here and the rough notes that I have received

13    copies.

14             MS. LONGO:  That's correct.

15             THE COURT:  And in terms of -- what is the

16    estimate of timing which forensic services will render a

17    report?

18             MS. LONGO:  Your Honor, we left a message with

19    Dr. Aconte today at 1 o'clock.  We have not been able to get

20    her to answer back our telephone calls.  We also spoke to

21    the Prosecutor for Justicia, Mr. Colina, and he also placed

22    a call to her.  I need to follow up on that information.

23             THE COURT:  Okay.

24             MR. GARAY:  Your Honor, I respectfully submit to

25    this Honorable Court --
```

1          MS. LONGO:  Excuse me.  I was just indicated,

2     prior -- there is prior testimony from Agent Ricardo Morales

3     on a prior detention hearing that was conducted before

4     Magistrate McGiverin that it was not disclosed yesterday but

5     just for information.  But it also had to do with --

6          THE COURT:  -- the prior arrest and not with this

7     case.

8          MS. LONGO:  Exactly.

9          THE COURT:  Okay.

10         MR. GARAY:  Your Honor, with due respect, this is

11    a detention hearing.  The Government has presented great

12    part of their case, a very important part of the case

13    regarding this particular Defendant.  And regarding the

14    identification of the accused is terrible.  At some point

15    during this evening I will bring or I will make the Court to

16    look side to side, Mitsubishi Lancer and the 4Runner, to see

17    if all what that agent told you that he could see he could

18    see, and I will show you he could not see what he says.  But

19    that's not so important at this point because this is not

20    the trial.  I am not trying to tell Your Honor that my

21    client is guilt is or innocent.  All I am saying is that

22    there are conditions and conditions of release that will

23    grant originally assure the safety of the community and the

24    probability that he will not leave this area.

25         As a matter of fact, we are proffering Your Honor

1    even the property -- as a matter of fact, present here in

2    court is his grandparents, Your Honor.  Grandparents are

3    here, are willing to put their property.  The grandfather is

4    here.

5          THE COURT:  That's the same property for which the

6    appraisal has been --

7          MR. GARAY:  Yes.  It's their property.  The

8    property that they lived for all their lives, working and

9    building together.  And they are willing to put it as a

10   guarantee, as the guarantee that Mr. Ramos-Barbosa,

11   Your Honor, will appear for further proceedings, and he does

12   not constitute a danger to the community.

13          As a matter of fact, Your Honor, the pretrial

14   report addresses this investigation.

15          THE COURT:  Very well, Mr. Garay.  Hold on.

16          I think I have heard plenty of information here,

17   and I know where the gist of the problem lies.  And,

18   actually, one revealing fact for me, even if I am to afford

19   credibility to the testimony of the agents here is that this

20   Defendant upon being called, he turned himself in and went

21   to the house.  And since then --

22          Yes?

23          MS. LONGO:  Since Defense counsel had an

24   opportunity to argue his case, the Government would like to

25   request an opportunity to also argue our position in this

1    case.

2              THE COURT:  Well, actually, I think I have just

3    interrupted his argument.  But what is it that you want me

4    to consider?

5              MS. LONGO:  Well, Your Honor, this case, one,

6    there is no evidence presented as to the fact that he

7    arrived to his house after having been called.

8              THE COURT:  I think the agent yesterday accepted

9    that.

10             MS. LONGO:  I don't think that that's any of the

11   evidence.

12             MR. GARAY:  Yes.  The agent admitted that

13   yesterday.  He said that they called him by the phone, and

14   that he appeared --

15             THE COURT:  That the wife called him at the work

16   in their presence and that he was told that the agents were

17   at the house.  And upon being requested, he returned.

18             MR. GARAY:  And that's when they arrested him.

19             THE COURT:  Take it easy.

20             MS. LONGO:  I stand corrected, Your Honor.

21             Despite that, Your Honor, the Government's

22   position that this is the quintessential case where the

23   presumption of detention addressed by Section 341(e) by

24   Congress, this is the one instant case where this type of

25   transaction, the money through the transaction, the nature

1     of what happened at this transaction is exactly what that

2     presumption is designed to address.

3          This is a multimillion dollar transaction where

4     the persons involved arrived to purchase 500 kilograms of

5     cocaine armed with -- as indicated in the exhibits, there

6     were five vehicles and five guns, fully loaded guns, that

7     were discharged at federal agents.  The dangerousness

8     expressed in this particular instance, it's clear, it's so

9     patently cleared that, as testified here today, the

10    Defendant actually was driving away from the scene after

11    having agents fully dressed and identified as agents trying

12    to detain him -- he almost ran over an agent.  An agent had

13    to run out of the way in order to save his life.

14         This Defendant, through his actions, the nature of

15    the offenses that have been charged, he has been

16    specifically identified as the driver of that vehicle that

17    was being used a weapon.  Despite the firearms, the vehicles

18    in this transaction were themselves used as weapons against

19    agents when they tried to perform an arrest.

20         This is the instant and the case where the

21    dangerousness of this Defendant and his willingness to

22    abscond from the Court by hiding the vehicle that he took

23    away from the place, burying it, as we saw 22 pictures

24    yesterday of how long it took to --

25              MR. GARAY:  I object to hiding the vehicle.  There

```
 1    is no shred of evidence --

 2              THE COURT:  I agree.

 3              MR. GARAY:  -- to establish who did that.

 4              THE COURT:  I agree that that vehicle was found in

 5    the neighborhood, but I think that from even the evidence

 6    presented, all the relatives, even the uncle who is a

 7    co-defendant, lives in the same neighborhood, could have

 8    been driven by anyone and placed there.  Whether it's highly

 9    questionable that from the place where he resides it could

10    be seen, because actually from the second level, you can

11    see.  And I don't think that you just hide the vehicle and

12    cover it with dirt in just five minutes.  That's an

13    operation that takes some time in getting it done.

14              MS. LONGO:  It takes a lot of people to

15    participate.

16              THE COURT:  That's one of the things that I have

17    to ponder, and I am pondering.

18              MS. LONGO:  That's correct.  So we have him

19    driving the vehicle out of the place, and then that vehicle

20    is buried.  The burial of that vehicle, as we agreed, is a

21    conduct that takes concerted effort by a group of people.

22    That cannot be done by an individual.

23              This Defendant has been shown to be a participant

24    of a drug trafficking organization that put together

25    $8.5 million to purchase 500 kilos of cocaine, that arrived
```

1    with $300,000 cash to the transaction.

2            THE COURT:  Do you know what the problem is -- and

3    I have no doubt as to the seriousness of the action that the

4    driver engaged by being there to provide surveillance, being

5    the one telling the passenger to shoot, by assisting in the

6    shooting, by being willing and able to attempt to ride over,

7    and I would not hesitate to detain such a person.  The

8    problem is that I have my reasonable doubts at this point on

9    the identity.  And I think it's a very sensitive issue as to

10   the case.  Very sensitive.  I am not saying that --

11           MS. LONGO:  Your Honor, we have three agents that

12   are fully confident on their identity of the Defendant.  The

13   investigation that has been done into the case confirms the

14   information provided by the agents.  It's the totality of

15   the investigation places the Defendant and does not place

16   anybody -- as indicated today by Agent Pizarro, when he went

17   to the house and they were looking for a person, one of the

18   residents of this house said, "The person that you are

19   looking for is not here.  He lives two streets down."  And

20   indicated the house where the Defendant lives.  "He lives

21   there with his common-law wife."  A few feet from where --

22           THE COURT:  But that was a statement said where?

23   At the residence of the uncle during the execution of the

24   search warrant?

25           MS. LONGO:  That's correct.  That's what

1    Agent Pizarro testified to here today, that one of the

2    residents of the house said, "The person that you are

3    looking for" -- and that was the person that provided the

4    agents the location of the Defendant's residence.  That's

5    how that residence was identified.

6             MR. GARAY:  Your Honor, we don't know the

7    questions presented to the person.  It's easy to come here

8    and try a case by hearsay of hearsay of hearsay.  That's

9    beautiful for the Government.  And that's exactly what the

10   bail reform act does not allow us to do, because the issue

11   of the bail reform act is can this person be released with

12   particular conditions.  That's it.

13            THE COURT:  I will be deciding this tomorrow.  I

14   need a copy of the transcript of today's hearing because,

15   actually, the statement to which reference has been made

16   here by the Prosecutor, I don't remember from Agent Pizarro.

17   I do remember that they were referred and got to the house,

18   but I know that the phone call was made and he was requested

19   to get there.  But I didn't make the connection alluded to

20   in the sense that on the house.  Was that at the request of

21   any officer asking specifically for this Defendant by name?

22            MS. LONGO:  Agent Pizarro testified here today

23   that he did not give the name.  That he said, "Do you

24   know" -- the person said, "The person you are looking for is

25   not here."

```
 1              MR. GARAY:  Yes.  And the person --

 2              MS. LONGO:  The resident of the house.

 3              MR. GARAY:  The person was not living here.  There

 4     are many persons living around this area.

 5              MS. LONGO:  But he indicated --

 6              THE COURT:  No.  You hold it.  She is the one

 7     talking.  And one thing is, you are being adamant about the

 8     defense and the other one is just trying to push their

 9     theory.  And I understand, it's a matter of argument, they

10     are arguing in order and just making things in the proper

11     way.

12              I will be reading the transcripts, and I will be

13     making a decision tomorrow.  And where I am right now, I

14     think I am inclined to set bail.  That's all I can say.

15              (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25
```

1    UNITED STATES DISTRICT COURT.)
                                  )  ss.
2    OF PUERTO RICO               )

3

4

5                    **REPORTER'S CERTIFICATE**

6

7

8          I, JOE REYNOSA, do hereby certify that the above

9    and foregoing, consisting of the preceding 52 pages,

10   constitutes a true and accurate transcript of my

11   stenographic notes and is a full, true and complete

12   transcript of the proceedings to the best of my ability.

13          Dated this 5th day of September, 2012.

14

15                         _____S/Joe Reynosa_____
                           Joe Reynosa
16                         Official Court Reporter
                           85 Calle Caribe, Apt 401
17                         San Juan, PR   00907
                           808-255-4840
18

19

20

21

22

23

24

25