IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

[5] NELSON J. RAMOS-
BARBOSA,

Defendant.

CRIM. NO.: 12-594(ADC/SCC)

## REPORT AND RECOMMENDATION

On July 27, 2012, agents from Homeland Security Investiga-
tions ("HSI") conducted a reverse sting operation in a K-mart
parking lot in Guaynabo. Among the many agents involved
were two HSI Special Agents and a Task Force Officer, all
together in an unmarked Mitsubishi Lancer. These three were
in the parking lot that day to provide cover to the undercover
agents involved in the reverse sting, and so they parked in the
remote corner of the parking lot where the sham cocaine was
to be sold, waiting and watching. At some point, a gray Toyota

4Runner, which other agents had already taken an interest in, parked next to the agents' vehicle. The agents in the Lancer thought the 4Runner suspicious—the behavior of its two occupants suggested that they were involved in the drug transaction going down in the parking lot.

Ultimately, something went wrong and the operation turned into a shootout, in which the Lancer's occupants became involved. Meanwhile, the 4Runner and its occupants fled the scene. A month later, though, Defendant Nelson J. Ramos-Barbosa was arrested. He is believed by the Government to have been the 4Runner's driver; allegedly, all three of the Lancer's occupants ultimately identified him as such. Before us now is Ramos-Barbosa's motion to suppress the agents out-of-court identifications of him, as well as to preclude any in-court identifications by the same agents. *See* Docket No. 164. Ramos-Barbosa has also filed a motion to suppress statements that he made to the Government after his arrest. *See* Docket No. 163. After a referral from the presiding district judge, Docket No. 176, and a hearing,[1] *see* Docket No.

---

1.    At the end of the hearing, counsel for Ramos-Barbosa was given the option of making argument or filing a post-hearing brief. He chose to file a brief, which the Court ordered due by close of business on March

248, we take up those motions below and recommend that each be denied.

## I. Suppression of Identifications

It is a narrow range of identifications that are properly suppressible. A court should suppress an eyewitness identification if it is the result of an "unnecessarily suggestive" procedure "arranged by law enforcement," but only after then determining that, based on the specific circumstances of the identification, "there is a 'very substantial likelihood of irreparable misidentification.'" *Perry v. New Hampshire*, 132 S. Ct. 716, 720–21 & n.1 (2012) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). Thus, even where the police *have* arranged an unnecessarily suggestive procedure, identification testimony will not be suppressed if "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances." *Id.* at 720. What we are looking for, then, are "indicators of [a witness's] ability to make an accurate identification." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

The Supreme Court only recently clarified that a court's

---

25, 2014. *See* Docket No. 248. No brief has been filed, however, and so our discussion below lacks the benefit of Ramos-Barbosa's arguments.

duty to screen eyewitness identifications is triggered only where the suggestive procedure is police-arranged. *See Perry*, 132 S. Ct. at 720–21. Before that, the First Circuit required reliability screening for *all* unnecessarily suggestive identification procedures, *see, e.g.*, *United States v. De Leon-Quiñones*, 588 F.3d 748, 754 (1st Cir. 2009) ("The government asserts that this confrontation cannot be deemed unnecessarily suggestive because it was not orchestrated or staged by the government. This argument is not particularly persuasive."), and it has not yet had the opportunity to discuss *Perry*'s particularities.[2]

---

**2.** In *United States v. Espinal-Almeida*, the First Circuit recognized that *Perry* had abrogated its prior precedents, and it discussed *Perry*'s applicability in a close case. *See* 699 F.3d 588, 603 n.16 (1st cir. 2012). In *Espinal*, a Police of Puerto Rico sergeant worked in an undercover anti-drug operation as a boat captain. *See id.* at 595. In this role, the sergeant participated in a drug transaction at sea, taking on cocaine from a mothership and seeing a few of the individuals involved. *See id.* at 595–96. Days later, the sergeant was asked by a colleague to download photographs of four arrestees in the case, including the defendant, from a camera. *See id.* at 602. According to the defendant, this tainted the sergeant's later, in-court identification. *See id.* Noting *Perry*, the Circuit concluded that whether this viewing of the photographs by the sergeant constituted a police-arranged procedure presented a close case. *Id.* at 603 n. 16. On one hand, it was "arranged by law enforcement in the sense that [the sergeant's] colleague asked him to download the pictures"; on the other hand, the sergeant's "viewing of the photos was really a simple side effect of his performance of an administrative task."

Nonetheless, we are of the opinion that under *Perry*, we should hold that two of the agents' identifications were not "police-arranged" because they were not arranged at all. In the case of Special Agent Duncan Campbell, the evidence adduced at the hearing showed that he was never asked to attempt to identify the 4Runner's driver. Instead, on August 20, 2012, he was involved in an operation executing search and arrest warrants at various residencies. SA Campbell's only role was to secure the buildings; he was not involved in any investigation. But at one of the houses searched that morning, agents arrested Ramos-Barbosa, and, independently, SA Campbell recognized him as the 4Runner's driver, which fact he told the case agent. Likewise, the evidence showed that Special Agent Anthony Vélez saw a picture of Ramos-Barbosa by chance when he visited the desk of TFO Antonio Pizarro. Without being prompted, SA Vélez identified the person in the picture as the 4Runner's driver. In neither case did the police purposefully

---

*Id.* The Circuit, however, did not decide which side of the line the procedure came down on. *Id.* ("Because it is a close call, and in the end we do not think any due process rights were impinged, we will assume that the photo downloading incident qualifies as being arranged by law enforcement and we will go on to consider whether it was unnecessarily suggestive.").

arrange any identification procedure. We would not, therefore, inquire into whether the procedures were unnecessarily suggestive. *United States v. Whatley*, 719 F.3d 1206, 1216 (11th Cir. 2013) ("*Perry* makes clear that, for those defendants who are identified under suggestive circumstances not arranged by police, the requirements of due process are satisfied in the ordinary protections of trial."). And even if we did make such an inquiry, we would find that SA Campbell's and SA Vélez's spontaneous identifications were not impermissibly suggestive. *Cf. Coleman v. Alabama*, 399 U.S. 1, 6 (1970) (finding no unnecessarily suggestive procedure where the witness's identification was "virtually spontaneous");[3] *United States v. López-López*, 282 F.3d 1, 11 (1st Cir. 2002) (finding that there was no unnecessarily suggestive procedure where the police-officer witnesses spontaneously identified the defendant after running into him at the police station); *Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196, 203 (2d Cir. 2010) ("[M]any federal circuit courts have found unarranged or accidental encounters

---

**3.**  This conclusion was reached in Justice Brennan's plurality opinion. *See Coleman v. Alabama*, 399 U.S. 1, 2 (1970) (Brennan, J.). However, Brennan's reasoning was adopted by the Court in *Perry*. *See Perry v. New Hampshire*, 132 S. Ct. 716, 726 (2012) (discussing *Coleman*).

between a witness and a criminal defendant not to be impermissibly suggestive . . . .").

As for TFO Pizarro's identification, it was certainly police-arranged: Special Agent Raúl Crespo showed him several photographs and asked whether he recognized any of them. TFO Pizarro identified one of the pictures as the 4Runner's driver. But we lack sufficient evidence to determine whether the procedure was impermissibly suggestive, such as how the photos were arranged or who, apart from Ramos-Barbosa, was depicted. *See, e.g., United States v. Holliday*, 457 F.3d 121, 125–26 (1st Cir. 2006) ("A photo array's suggestiveness normally is evaluated by determining whether it so far as practicable included a reasonable number of persons similar to any person then suspected whose likeness is included in the array." (internal quotations and alterations omitted)). As such, we will assume that the procedure was impermissibly suggestive and will proceed to consider whether there are sufficient indicia of reliability to allow TFO Pizarro's identification to go to the jury.[4] *Cf. United States v. Espinal-Almedia*, 699 F.3d 588, 603 (1st

---

4.  This assumption is somewhat generous, however, as courts have generally held that it is the defendant that has the burden of showing that an identification procedure was impermissibly suggestive. *See*

Cir. 2012) (assuming, where the record as to the identification procedure's details was insufficiently developed, that the procedure had been impermissibly suggestive).

In considering whether an identification was sufficiently reliable to overcome an impermissibly suggestive procedure, we consider a variety of factors including the witness's "opportunity to view the suspect at the time of the crime; the witness' degree of attention; the accuracy of the description of the defendant prior to identification; confidence at the time of identification; and the length of time elapsed between the crime and the identification." *United States v. Jones*, 689 F.3d 12, 18 (1st Cir. 2012). Here, TFO Pizarro's identification was made in broad daylight and from a close distance;[5] as he was parked

----

*United States v. Jones*, 689 F.3d 12, 17 (1st Cir. 2012) ("[E]yewitness identification evidence is subject to special limitations where, as a first step, *the opponent* establishes that it was developed in an unnecessarily suggestive manner." (emphasis added)); *see also Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005) (holding that the defendant "bears the burden of showing impermissible suggestiveness"). Ramos-Barbosa has failed to meet this burden. This provides an independent basis for denying suppression with regard to TFO Pizarro.

**5.**   During the hearing, there was much discussion of the vehicles' tint. The evidence showed that the Lancer was heavily tinted but that its occupants could easily and clearly see outside of it. As for the 4Runner, Ramos-Barbosa's counsel strongly suggested during his cross-

next to the 4Runner for some time, he had a chance to view the driver at his leisure; he was paying particular attention, moreover, to the 4Runner's occupants, because their activities had aroused his and the other agents' suspicions. All of these factors point toward the reliability of his identification. On the other hand, the description that TFO Pizarro wrote in his notebook the day of the operation—thin, red shirt, glasses—was not particularly descriptive, and when TFO Pizarro looked at the pictures with SA Crespo, he identified Ramos-Barbosa as the 4Runner's driver only after drawing glasses on his face. Nonetheless, we conclude that, given the totality of the circumstances,[6] TFO Pizarro's identification of

---

examination of the agents that its tint had been similarly dark, but no evidence in support of this proposition was ever introduced. Instead, the agents testified that while the 4Runner's windows were tinted, its tint was less dark than that of the Lancer. Photographic evidence was unavailable, because the 4Runner was destroyed sometime after July 27, presumably by its occupants or others caught on the wrong side of the reverse sting. (The 4Runner was eventually dug out of the ground where it had been buried, behind a group of houses occupied by Ramos-Barbosa and other members of his family, including his father and co-defendant, Nelson J. Ramos-Ramos.)

**6.**  *See United States v. Melvin*, 730 F.3d 29, 34 (1st Cir. 2013) (providing that the reliability inquiry should be made based on the "totality of the circumstances").

Ramos-Barbosa is admissible. With regard to the identification, its vagueness warrants little weight, as TFO Pizarro was never apparently asked to make a detailed description. And while TFO Pizarro's need to draw glasses on Ramos-Barbosa's picture says something about his certainty at that moment, we think, given the favorable circumstances under which TFO Pizarro was able to view the 4Runner's driver, that there is not "a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384. Moreover, Ramos-Barbosa will be allowed to use TFO Pizarro's uncertainty to his benefit at trial.[7] *See Jones*, 689 F.3d at 17 ("[E]vidence is not normally sup-

---

**7.** There are other inconsistencies in TFO Pizarro's story, too. At some point, TFO Pizarro accompanied SA Crespo to a prison in Bayamon to interview a prisoner about the identity of the 4Runner's driver. A photograph of Ramos-Barbosa was shown to the prisoner, but we do not know whether TFO Pizarro saw it at that time. At Ramos-Barbosa's de novo bail review hearing, TFO Pizarro said that he participated in this interview, *see* Docket No. 21, at 19, but at the suppression hearing he said that he waited outside while SA Crespo interviewed the prisoner. We might chalk that up to imprecision if, at the de novo bail review hearing, TFO Pizarro had not claimed to have asked the prisoner specific questions. *See id.* at 20. These inconsistencies are not meaningless, but, as we have explained, they do not go to the reliability of TFO Pizarro's identification. *Cf. Perry*, 132 S. Ct. at 720 (directing courts to admit identification evidence where "the indicia of reliability" of that identification "are strong enough to outweigh the corrupting effect" of any suggestive, police-arranged procedure).

pressed because it is debatable or arguably unreliable—much testimony at trial is of this character—and customarily cross-examination is the means of testing the strength of such evidence."). Suppression, however, is unwarranted. *See De Quiñones*, 588 F.3d at 753 ("Identification evidence is for the jury in all but extraordinary cases." (internal quotations omitted)); *López-López*, 282 F.3d at 11 ("The likelihood of misidentification must be very strong in order to suppress evidence."). Likewise, even if we had concluded that the identification testimony of SA Campbell and SA Vélez had been tainted by an unreasonably suggestive police procedure, we would recommend denying suppression for the same reason that we recommended denying it as to TFO Pizarro. Both agents testified to their clear view of the 4Runner's driver,[8] as well as to the generally favorable viewing conditions

---

**8.** Ramos-Barbosa's primary focus during the hearing was on suggesting that the agents could not have seen inside the 4Runner from their positions in the Lancer. The evidence shows that the Lancer was parked backwards in a parking space, while the 4Runner was parked front-in on the Lancer's passenger side. The Lancer, moreover, was lower than the 4Runner. Ramos-Barbosa requested that we schedule an inspection of a similar set-up, a request we took under advisement. We now deny it. To begin with, the 4Runner no longer exists. More to the point, our concern at the hearing was not with whether the agents *actually saw* Ramos-Barbosa; it was whether the circumstances in which they claim

that existed that day. Moreover, SA Campbell specifically testified that he took particular note of the driver, because his presence was a potential threat to SA Campbell, the other agents in the Lancer, and the undercover agents involved in the operation. As such, he made a particular effort to focus on the driver and his activities, making his identification more reliable. *Cf. id.* at 18 (finding the identification reliable where it was made in broad daylight, for "ten or fifteen seconds," and

---

to have seen him had sufficient indicia of reliability to permit them to testify to a jury that they had seen him. We think that the agents' forceful testimony that they clearly saw the vehicle's driver, as well as the favorable viewing circumstances, settle this question; indeed, how else, other than having observed him on July 27, would TFO Pizarro have known to draw glasses on Ramos-Barbosa's photograph? As such, we will not, on Ramos-Barbosa's unsupported supposition that the agents couldn't see into the 4Runner, conduct such an inspection (which would, undoubtedly, involve lengthy and unsolvable arguments about the vehicles' tint, height, and relative positions). We see such a dispute as for the jury, if the discretion of the presiding judge determines that it would be useful. For current purposes, it is enough to say that the identification was made under sufficiently reliable circumstances that it should go to a jury, where it can be challenged in all the ways as would be any other evidence. *See Perry*, 132 S. Ct. at 723 ("The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit.").

where the witness was a law enforcement officer whose suspicion had been aroused by the defendant's conduct). We therefore recommend that the agents' identification testimony not be suppressed.

## II. Suppression of Statements

According to a motion filed by Ramos-Barbosa, he was interrogated for several hours before being read his *Miranda* rights. Docket No. 163, at 3–4. Moreover, Ramos-Barbosa argues that he was coerced into signing a waiver of his *Miranda* rights, and he claims that he was interrogated in such a way that it overbore his will, making his statements involuntary. *Id.* at 5–7. At the hearing, HSI Special Agent Miguel Bermúdez, who interrogated Ramos-Barbosa, testified; Ramos-Barbosa did not.

According to SA Bermúdez's credible testimony, Ramos-Barbosa was interviewed in a conference room at HSI's San Juan headquarters. SA Bermúdez began by asking basic biographical questions—date of birth, name, education level, marital status—all of which Ramos-Barbosa answered. SA Bermúdez then gave Ramos-Barbosa a *Miranda* warning. While SA Bermúdez read the rights aloud, he also went over with Ramos-Barbosa each right on a printed, Spanish-language

waiver form. Ramos-Barbosa indicated that he could read and write, and he appeared to understand the rights—he said he had studied criminal justice—and he initialed each. He also signed the waiver form. Initially, Ramos-Barbosa looked apprehensive, but he calmed noticeably during the course of the interrogation; he was not restrained, and he never asked for a lawyer or to stop. SA Bermúdez admitted that during the questioning he might have said that Ramos-Barbosa's best option was to cooperate, and he did at some points accuse Ramos-Barbosa of being untruthful. Nonetheless, we see no evidence that the interrogation was anything other than typical and consensual. Suppression would, therefore, be improper.

### III.    Conclusion

For all of the reasons stated above, we RECOMMEND that Defendant Ramos-Barbosa's motion to suppress statements, Docket No. 163, and motion to suppress identifications, Docket No. 164, be DENIED.

IT IS SO RECOMMENDED.

The parties have fourteen days to file any objections to this report and recommendation. Failure to file the same within the specified time waives the right to appeal this report and recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-

51 (1st Cir. 1994); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 26th day of March, 2014.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE