IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>[4] NELSON RAMOS-RAMOS,<br>Defendant. | CRIM. NO. 12-594 (ADC) |

### PLEA AGREEMENT

**TO THE HONORABLE COURT:**

The United States of America, by and through its attorneys, Rosa Emilia Rodríguez Vélez, United States Attorney for the District of Puerto Rico, José A. Ruiz, Assistant U.S. Attorney, Chief, Criminal Division, Jenifer Y. Hernández Vega, Assistant U.S. Attorney, Deputy Chief, Narcotics Division, and Dennise N. Longo Quiñones, Assistant U.S. Attorney, Narcotics Division, the defendant, Nelson Ramos-Ramos, and the defendant's counsel, Carlos Vázquez-Alvarez, Esq., and state that they have reached an agreement pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

**OFFENSE TO WHICH DEFENDANT PLEADS GUILTY**

1. Nelson Ramos-Ramos agrees to plead guilty to Count One of the Second Superseding Indictment (ECF No. 102).

2. Count One of the Second Superseding Indictment charges the defendant herein with from on or about July 26, 2012, and continuing to on or about July 27, 2012, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court, knowingly and intentionally combining, confederating, and agreeing, with the co-defendants and other persons known and unknown to

the Grand Jury, to possess with intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance. All in violation of Title 21, *United States Code*, Sections 846 and 841(a)(1) and (b)(1)(A)(ii).

**MAXIMUM PENALTIES**

3. In this regard, the defendant understands that in relation to Count One the penalties for the offenses charged are a term of imprisonment of not less than 10 years and not more than life, a fine not to exceed ten (10) million dollars and a term of supervised release of at least five years.

**STIPULATION**



4. The parties have agreed that for purpose of this Plea Agreement, the defendant is accountable for conspiring to possess with intent to distribute at least 50 KG but less than 150 KG of cocaine.

**APPLICABILITY OF SENTENCING GUIDELINES**

5. The defendant understands that the sentence will be left entirely to the sound discretion of the Court in accordance with the advisory Sentencing Guidelines, Title 18, *United States Code*, Section 3551, *et. seq.* (hereinafter the "Guidelines"). It is further understood that the defendant may not withdraw defendant's plea solely as a result of the sentence imposed and the Court is not bound by this plea agreement. The defendant acknowledges and understands that parole has been abolished.

**SPECIAL MONETARY ASSESSMENT**

6.      Prior to or at the time of sentencing, the defendant shall pay a special assessment of one-hundred dollars ($100.00), per count, as required by Title 18, *United States Code*, Section 3013(a).

**FINES AND RESTITUTION**

7.      The defendant is aware that the Court may, pursuant to Section 5E1.2(i) of the *Sentencing Guidelines, Policy Statements, Application, and Background Notes*, order the defendant to pay a fine sufficient to reimburse the government for the costs of any imprisonment, probation or supervised release. The defendant is aware that in some instances, the Court may impose restitution to the victim. As part of this plea agreement, and should the Court impose restitution upon the defendant, the defendant agrees to produce complete information regarding all restitution victims and defendant agrees to execute a financial statement to the United States (OBD Form 500).

**SENTENCING GUIDELINES CALCULATIONS**

8.      Although the Guidelines are now advisory in nature, the sentencing court, in imposing sentence, is required to consider the Guidelines "sentencing range established for the applicable category of the offense committed by the defendant". *United States v. Booker*, 125 S.Ct. 738 (2005). Therefore, the United States and the defendant submit the following Advisory Sentencing Guideline calculations:



Plea Agreement                                                                                          Page 3

| SENTENCING GUIDELINES CALCULATION TABLE ||
|---|---|
| Based on the amount of controlled substance stipulated by the parties, that is at least 50 KG but less than 150 KG of cocaine, the Base Offense Level shall be 36, pursuant to the Drug Quantity Table in U.S.S.G. § 2D1.1. | 36 |
| Possession of a dangerous weapon, pursuant to U.S.S.G. § 2D1.1(b)(1) | +2 |
| Should defendant clearly demonstrate acceptance of responsibility for the offense, defendant's base offense level shall be further reduced by three (3) levels, pursuant to U.S.S.G. § 3E1.1. | -3 |
| TOTAL OFFENSE LEVEL<br>Assuming a Criminal History Category of I,<br>Assuming a Criminal History Category of II,<br>Assuming a Criminal History Category of III, | 35<br>(168-210)<br>(188-235)<br>(201-262)<br>Subject to a minimum statutory of 120 months. |
| The parties make no stipulation as to defendant's Criminal History Category. ||



## RULE 11(e)(1)(B) WARNINGS

9. Defendant understands that, pursuant to Rule 11(e)(1)(B) of the Federal Rules of Criminal Procedure, the Court is not bound by these sentencing guidelines calculations, that is, the Court may impose a harsher or lesser sentence in spite of the recommendations set forth herein. Also, the defendant understands that defendant may not withdraw defendant's plea solely as a result of the final sentencing guidelines calculations made by the Court.

## SENTENCE RECOMMENDATION

10. The parties will recommend a sentence within the applicable guideline range for an adjusted base offense level of 35. The defendant agrees that this sentence is reasonable pursuant to Title 18, *United States Code*, Section 3553 (a).

Plea Agreement                                                                                      Page 4

**NO STIPULATION AS TO CRIMINAL HISTORY CATEGORY**

11. The parties make no stipulation as to defendant's Criminal History Category.

**NO FURTHER ADJUSTMENTS OR DEPARTURES**

12. The United States and the defendant agree that no further adjustments or departures to the defendant's base offense level shall be sought by the parties. The parties agree that any request by the defendant for an adjustment, departure, or a lower sentence will be considered a material breach of this Plea Agreement and the United States will be able to request the withdrawal of the Plea Agreement.

**SATISFACTION WITH ATTORNEY**

13. The defendant, represents to the Court that defendant is satisfied with defendant's attorney, Carlos Vázquez-Alvarez, Esq., and hereby indicates that counsel has rendered effective legal assistance.

**RIGHTS SURRENDERED BY DEFENDANT THROUGH GUILTY PLEA**

14. Defendant understands that by entering into this agreement, defendant surrenders certain rights as provided in this agreement. Defendant understands that the rights of criminal defendants include the following:

    a. If the defendant had persisted in a plea of not guilty to the charges, defendant would have had the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if the defendant, the United States and the judge agree.

    b. If a jury trial is conducted, the jury would be composed of twelve lay persons selected at random. The defendant and the defendant's attorney would assist



in selecting the jurors by removing prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges. The jury would have to agree, unanimously, before it could return a verdict of either guilty or not guilty. The jury would be instructed that the defendant is presumed innocent, and that it could not convict the defendant unless, after hearing all the evidence, it was persuaded of the defendant's guilt beyond a reasonable doubt, and that it was to consider each charge separately.

   c. If a trial is held by the judge without a jury, the judge would find the facts and, after hearing all the evidence and considering each count separately, determine whether or not the evidence established the defendant's guilt beyond a reasonable doubt.

   d. At a trial, the United States would be required to present its witnesses and other evidence against the defendant. The defendant would be able to confront those witnesses and defendant's attorney would be able to cross-examine them. In turn, the defendant could present witnesses and other evidence on defendant's own behalf. If the witnesses for the defendant would not appear voluntarily, defendant could require their attendance through the subpoena power of the Court.

   e. At a trial, the defendant could rely on the privilege against self-incrimination to decline to testify, and no inference of guilty could be drawn from defendant's refusal to testify. If the defendant desired to do so, the defendant could testify on defendant's own behalf.



Plea Agreement                                                   Page 6

## STIPULATED VERSION OF FACTS

15.   The accompanying Stipulated Version of Facts signed by the defendant is hereby incorporated into this plea agreement.  Defendant adopts the Version of Facts and agrees that the facts therein are accurate in every respect and that, had the matter proceeded to trial, the United States would have proven those facts beyond a reasonable doubt.

## JURISDICTIONAL LIMITS OF PLEA AGREEMENT

16.   It is specifically understood by the defendant, that this plea agreement does not extend to or bind other federal districts, federal civil and/or tax authorities, and/or State or Commonwealth of Puerto Rico tax authorities, civil and/or State or Commonwealth of Puerto Rico law enforcement authorities.

## WAIVER OF APPEAL

17.   The defendant knowingly and voluntarily waives the right to appeal the judgment and sentence in this case, provided that the defendant is sentenced in accordance with the terms and conditions set forth in the Sentence Recommendation provisions of this Plea Agreement.

## DISMISSAL OF REMAINING COUNTS

18.   As part of this plea agreement, the United States, after sentencing, will request the dismissal of the remaining counts of the Indictments pending against the defendant, pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure.

## ENTIRETY OF PLEA AGREEMENTS AND AMENDMENTS

19.   The United States and the defendant acknowledge that the above-stated terms and conditions constitute the entire plea agreement between the parties and deny the existence of any



other terms and conditions not stated herein. No additional promises, terms or conditions will be entered unless in writing and signed by all parties.

### VOLUNTARINESS OF PLEA

20. It is understood by the defendant, that defendant is entering into this plea agreement without compulsion, threats, or any other promises from the United States Attorney or any of his agents. The defendant acknowledges that no threats have been made against the defendant and that the defendant is pleading guilty freely and voluntarily because the defendant is, in fact, guilty.

### BREACH AND WAIVER

21. The defendant understands and agrees that if the defendant breaches the plea agreement, the defendant may be prosecuted and sentenced for all of the offenses the defendant may have committed. The defendant agrees that if the defendant breaches this plea agreement, the Government reserves the right to take whatever steps are necessary to nullify the plea agreement, including the filing of a motion to withdraw from the plea agreement and/or to set aside the conviction and sentence. The defendant also agrees that if he is in breach of this plea agreement, the defendant is deemed to have waived any objection to the reinstatement of any charges under the indictment, information, or complaint which may have previously been dismissed or which may have not been previously prosecuted.

[INTENTIONALLY LEFT IN BLANK.]



**RESPECTFULLY SUBMITTED.**

**ROSA EMILIA RODRIGUEZ VELEZ**
United States Attorney

_____
José Ruíz Santiago
Assistant U.S. Attorney
Chief, Criminal Division
Dated: 3/26/14

_____
Jenifer Hernández-Vega
Assistant U.S. Attorney
Deputy Chief, Narcotics Division
Dated: 3/25/2014

_____
Dennise N. Longo Quiñones
Assistant U.S. Attorney
Dated: 3/25/2014

_____
Carlos Vázquez-Álvarez, Esq.
Counsel for Defendant
Dated: 3/31/14

_____
Nelson Ramos-Ramos
Defendant
Dated: 3/31/14



Plea Agreement

Page 9

I have consulted with my counsel and fully understand all my rights with respect to the Indictment pending against me. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the *Sentencing Guidelines, Policy Statements, Application, and Background Notes* which may apply in my case. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. My counsel has translated the plea agreement to me in the Spanish language and I have no doubts as to the contents of the agreement. I fully understand this agreement and I voluntarily agree to it.

Date: 3/31/14

Nelson Ramos-Ramos
Defendant

I am the attorney for the defendant. I have fully explained to the defendant the defendant's rights with respect to the pending indictment. Further, I have reviewed the provisions of the *Sentencing Guidelines, Policy Statements, Application, and Background Notes*, and I have fully explained to the defendant the provisions of those guidelines which may apply in this case. I have carefully reviewed every part this Plea Agreement with the defendant. I have translated the plea agreement and explained it in the Spanish language to the defendant who has expressed having no doubts as to the contents of the agreement. To my knowledge, the defendant is entering into this agreement voluntarily, intelligently and with full knowledge of all the consequences of defendant's plea of guilty.

Date: 3/31/14

Carlos Vázquez-Alvarez, Esq.
Counsel for Defendant



Plea Agreement

Page 10

**STIPULATED VERSION OF THE FACTS**

In conjunction with the submission of the accompanying Plea Agreement in this case, the United States submits the following summary setting forth the version of the facts leading to defendant's acceptance of criminal responsibility for violating Title 21, *United States Code*, Sections 846 and 841(a)(1) and (b)(1)(A)(ii).

Had the government proceeded to trial, it would have presented the testimony of witnesses, confidential sources, law enforcement officers and expert witnesses, as well as submitted into evidence consensual recordings, photographs and items seized pursuant to an undercover sale of cocaine, to prove beyond a reasonable doubt that:

In or about July, 2012, an HSI undercover agent (the "UC") had been participating in an investigation into the operations of a drug trafficking organization ("DTO") that smuggles and transports controlled substances from Colombia into Puerto Rico and the Continental United States received information that an individual identified as "PERRO" was interested in purchasing 500 kilograms of cocaine in Puerto Rico. Thereafter, the UC coordinated the details of the transaction by Blackberry Messenger ("BBM") using PERRO's PIN Number: XXXFE531.

On July 26, 2012, the UC agreed with PERRO through BBM communication that PERRO would purchase 500 kilograms of cocaine at a purchase price of $17,000.00 per kilogram of cocaine, for a total purchase price of $8,500,000.00, in addition to the payment of a transportation cost of $1,000,000.00. The $1,000,000.00 transportation cost was to be paid in three installments. $300,000.00 was to be paid immediately upon delivery of the 500 kilograms of cocaine, while the remainder was to be paid after the sale of the drugs in installments of $300,000.00 and $400,000.00, respectively. The $8,500,000.00 purchase price would be paid in partial, periodic payments that would commence a week after the delivery of the 500 kilograms of cocaine.



Plea Agreement                                                                                                                Page 11

Through further BBM communications, the UC and PERRO agreed that they would meet on July 27, 2012, at approximately 10:00 a.m. in order to proceed with the exchange of drugs and money. On July 27, 2012, at approximately 10:00 a.m., the UC and PERRO exchanged BBM communications through which PERRO provided telephone number: 718-XXX-8084 to the UC and asked to be contacted to coordinate the details for the transaction. PERRO and the UC then exchanged multiple telephone calls, which were consensually recorded by the UC, during which they agreed to proceed with the exchange of drugs and money at the parking lot of Plaza Guaynabo located in Guaynabo, Puerto Rico. They further agreed that PERRO would arrive in a vehicle containing the initial payment of $300,000.00 while an individual working in association with the UC (an HSI undercover agent ("UC#2")) would arrive in a vehicle containing the purported cocaine. After inspection of the money and the purported cocaine by both parties, PERRO would leave in the vehicle containing the cocaine and UC#2 would leave in the vehicle containing the money. The parties would simply exchange cars rather than move the drugs and money from one car to the other.

Pursuant to the communications between PERRO and the UC, HSI agents, in coordination with agents from the Drug Enforcement Administration (collectively the "Agents") coordinated an operation to deliver 500 kilograms of a substance purported to be cocaine at Plaza Guaynabo on July 27, 2012 at approximately 2:00 p.m. The Agents arrived on scene in advance to set up multiple surveillance points and stage several security coverage teams to ensure the safety of all UC participants, the arresting officers and civilians in the area. The surveillance team also set up a video recorder (the "HSI VIDEO") to record the exchange between the UC and PERRO.

Pursuant to the agreement, the UC arrived at Plaza Guaynabo in a RED UNDER COVER VEHICLE ("UC VEHICLE #1") at approximately 12:00 p.m. The UC parked his vehicle in the Northeast corner of the parking lot, an area that was far from the main entrance to the adjacent businesses and fairly secluded. From approximately 1:00 pm through 2:00 p.m., the Agents identified several



Plea Agreement

vehicles that appeared to be providing counter-surveillance to PERRO, namely, a GREY MITSUBISHI LANCER (the "DTO LANCER"), a GREY TOYOTA 4RUNNER (the "DTO 4RUNNER), a WHITE TOYOTA TERCEL (the "DTO TERCEL"), and a RED MERCEDES BENZ (the "DTO MERCEDES"). The movement and presence of the DTO counter-surveillance vehicles is documented in the HSI VIDEO and in a surveillance video recorded by a Customs and Border Protection air unit assigned to oversee the operation (the "CBP VIDEO").



At approximately 1:50 p.m., PERRO informed the UC by telephone that he was a few minutes away and that he will be arriving in a Grey vehicle accompanied by a passenger. Several minutes later, a SILVER BMW X-5 (the "DTO BMW"), with two occupants, **[1] ELVIN RIVERA ERAZO** and **[2] JORGE LUIS GONZALEZ-RAMOS**, entered the area and parked in a space near the exit of the parking lot. At approximately the same time, the DTO LANCER entered the area with two occupants, **[3] ALEX MATIAS MAESTRES** and **ANGEL CARMONA MARCANO a.k.a. "BOCA" or "BOQUILLA,"** and parked one row East of where the DTO BMW had parked, in a position from which the occupants of the vehicle could maintain visual surveillance of both UC VEHICLE #1 and the DTO BMW. The occupants of the DTO LANCER remained inside the vehicle, kept the motor running, surveyed the whole parking lot and spoke on the phone continuously.

The DTO TERCEL entered the area right behind the DTO LANCER and parked in the row directly across from the DTO BMW, three or four spots to the North of the DTO BMW. From that location the driver and sole occupant of the DTO TERCEL, ELVIN OMEL RIVERA ORTIZ, could maintain visual surveillance of both the DTO BMW and UC VEHICLE #1.

Around the same time that the DTO LANCER and the DTO TERCEL arrived on scene, a third vehicle, the DTO 4RUNNER, arrived as well. The DTO 4RUNNER, with two occupants, the defendant **[4] NELSON RAMOS-RAMOS** and **[5] NELSON RAMOS-BARBOSA**, parked directly across from the DTO TERCEL, three or four spots to the North of where the DTO BMW was parked, a location from which the two occupants of the DTO 4RUNNER could maintain



visual surveillance of both the DTO BMW and UC VEHICLE #1. The occupants of the DTO 4RUNNER remained inside the vehicle, surveyed the whole parking lot and continued talking on the phone.

The DTO MERCEDES was also seen parked close to where the DTO BMW originally parked. Several minutes later, the DTO MERCEDES moved approximately five rows in front of DTO BMW, to a location where the occupant of the DTO MERECEDES could have better visual surveillance of the area on the Northeast corner of the parking lot where the UC VEHICLE # 1 was located. The occupant of the DTO MERCEDES, **[6] ANGEL CORREA RIVERA**, remained inside the vehicle, kept the motor running and appeared to be talking on the phone continuously.



A few minutes later, **[1] ELVIN RIVERA ERAZO** got out of DTO BMW and walked towards the UC and UC VEHICLE #1 in the Northeast end of the parking lot. After having a conversation with the UC next to UC VEHICLE #1, **[1] ELVIN RIVERA ERAZO** asked the UC to accompany him to the DTO BMW so he could show him the $300,000.00 that he brought to purchase the cocaine. The UC accompanied **[1] ELVIN RIVERA ERAZO** to the DTO BMW, which was located in the middle of the parking lot, where he was shown a backpack containing a large amount of US currency in the trunk of the DTO BMW. While walking from UC VEHICLE #1, located in the Northeast corner of the parking lot, to the DTO BMW, **[1] ELVIN RIVERA ERAZO** made hand signals to the occupants of the DTO 4 RUNNER and the DTO LANCER. **[1] ELVIN RIVERA ERAZO** told the UC that the backpack in the trunk held only a portion of the money and that a shopping bag in the front seat contained the remaining portion of the $300,000.00 payment.

After viewing the money, the UC advised **[1] ELVIN RIVERA ERAZO** that he would call his associate, UC#2, to bring UC VEHICLE #2, a grey KIA SEDONA containing the Sham Cocaine and park it next to UC VEHICLE #1. The UC walked back to the Northeast corner of the parking lot while **[1] ELVIN RIVERA ERAZO** remained in the DTO BMW with **[2] JORGE LUIS GONZALEZ-RAMOS**, who was holding a Glock Model 21 .45 caliber firearm

with two .45 caliber extended ammunition clips and one regular .45 caliber ammunition clip.

Once **[1] ELVIN RIVERA ERAZO** saw UC VEHICLE #2 park next to UC VEHICLE #1, he moved the DTO BMW and backed it into the space directly adjacent to UC VEHICLE #2. When **[1] ELVIN RIVERA ERAZO** moved the DTO BMW, his son ELVIN OMEL RIVERA ORTIZ moved the DTO TERCEL from its original parking spot towards the Northeast corner of the parking lot where the exchange of drugs and money was to take place.

After parking next to UC VEHICLE #2, **[1] ELVIN RIVERA ERAZO** and **[2] JORGE LUIS GONZALEZ-RAMOS** got out of DTO BMW and walked to the back of UC VEHICLE #2, where the UC and UC#2 opened the trunk to show them the fourteen (14) sports equipment bags containing the 500 kilograms of sham cocaine. The duffle bags were packed into the back seat and trunk of UC VEHICLE #2. Upon inspecting the trunk of UC VEHICLE #2 and as captured in the HSI VIDEO and the CBP VIDEO, **[2] JORGE LUIS GONZALEZ-RAMOS** proceeded to get into the driver seat of UC VEHICLE #2 and **[1] ELVIN RIVERA ERAZO** adjusted his baseball cap in an evident sign to the occupants of the counter-surveillance vehicles. Then, instead of handing over the keys of the DTO BMW to the UC as agreed, **[1] ELVIN RIVERA ERAZO** got back into the driver seat of the DTO BMW.

At that moment, the Agents scattered around the parking lot conducting surveillance exited their vehicles, identified themselves and announced the arrests. Immediately after the Agents identified themselves and announced the arrests, the targets began to flee. **[1] ELVIN RIVERA ERAZO** in the DTO BMW and ELVIN OMEL RIVERA ORTIZ in the DTO TERCEL sped out of their parking spaces and almost ran over the arresting officers with their vehicles as they attempted to flee. The DTO LANCER also attempted to back out of its parking spot despite the Agents' order to stop. The DTO 4RUNNER sped out of its parking spot while one or more of its occupants fired weapons at the Agents and fled the parking lot without being detained.



[1] **ELVIN RIVERA-ERAZO** was detained as he was attempting to flee. [2] **JORGE LUIS GONZALEZ-RAMOS**, who was inside the UC VEHICLE #2, was found to be wearing a holster and the Glock Model 21 .45 caliber firearm, the two .45 caliber extended ammunition clips and the .45 caliber regular ammunition clip he brought in the DTO BMW were found on the floor below the driver's seat of the UC VEHICLE #2. Upon detention, the driver of the DTO LANCER was [3] **ALEX MATIAS-MAESTRES** and three telephones and two firearms were seized from within the DTO LANCER. The firearms seized from the DTO LANCER included: a Smith & Wesson .357 caliber Revolver recovered from [3] **ALEX MATIAS-MAESTRES**, and a Glock Model 22 .40 caliber recovered from the glove compartment of the DTO LANCER loaded with 12 rounds in the magazine and one in the chamber. Inside the glove compartment, adjacent to the fully loaded Glock Model 22, the Agents also recovered an extended magazine clip loaded with 22 rounds. Upon detention, after the DTO TERCEL was crashed into the DTO MERCEDES, the driver of the DTO MERCEDES was [6] **ANGEL CORREA-RIVERA**.

Approximately 14 cellular telephones were seized by Agents at Plaza Guaynabo upon inspection of the vehicles incident to arrests. Some of the cellular telephones seized belonged to: [1] **ELVIN RIVERA-ERAZO**, [2] **JORGE LUIS GONZALEZ-RAMOS**, [3] **ALEX MATIAS-MAESTRES**, [6] **ANGEL CORREA-RIVERA, ELVIN OMEL RIVERA-ERAZO,** and **ANGEL CARMONA MARCANO a.k.a. "BOCA" or "BOQUILLA."**. An LG telephone (with assigned number 787-661-9625) recovered from UC VEHICLE #2 revealed that a call was placed on July 27, 2012, from that LG telephone to telephone number 787-222-8625; which telephone was identified as belonging to the passenger of the DTO LANCER identified as **ANGEL CARMONA MARCANO a.k.a. "BOCA" or "BOQUILLA."**

Analysis of the toll records of the Apple Iphone with assigned number 787-429-6518 seized from [6] **ANGEL CORREA-RIVERA** on July 27, 2012, revealed that on July 27, 2012, between 12:28pm and 1:59pm, that telephone made and/or received approximately 11 calls to/from the BlackBerry Curve with



Plea Agreement

Page 16

assigned telephone number (787) 222-8625 discovered inside the DTO LANCER. Some of those telephone calls were made during the time of the drug transaction in Plaza Guaynabo while **[6] ANGEL CORREA-RIVERA** was seen surveying the parking lot and talking on the telephone.

On August 22, 2014, the defendant **[4] NELSON RAMOS-RAMOS** admitted his participation as a look out and enforcer at the transaction and indicated he discharged two firearms against law enforcement personnel after the order to stop was given and the law enforcement personnel identified themselves.

**The defendant [4] NELSON RAMOS-RAMOS agrees and acknowledges that during the above drug transaction at Plaza Guaynabo on July 27, 2012, he was the front passenger of the aforementioned DTO 4RUNNER and co-defendant [5] NELSON RAMOS-BARBOSA was the driver of the DTO 4RUNNER.**

The parties have agreed that for purpose of this Plea Agreement the defendant **[4] NELSON RAMOS-RAMOS** is accountable for conspiring to possess with intent to distribute at least 50 KG but less than 150 KG of cocaine. Full discovery was timely provided to the defense.

_____
Dennise N. Longo Quiñones
Date: 3/25/2014

_____
Nelson Ramos-Ramos
Date: 3/31/14

_____
Carlos Vázquez-Alvarez, Esq.
Date: 3/31/14